Felicia A. Mobley, Esq. (SBN: 189892)
MOBLEY LAW OFFICE, PC
800 W 6th Street, Suite 310
Los Angeles, California 90017
Tel: (213) 891-1000 Fax: (213) 891-1007
*fm@mobleylawoffice.com*

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AFRICAN FIREFIGHTERS IN BENEVOLENT ASSOCIATION, an unincorporated association, JABARI JUMAANE, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> MARQUEECE HARRIS-DAWSON, an individual and in his capacity as a Los Angeles City Councilmember; THE CITY OF LOS ANGELES, a public entity; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. <br><br> COMPLAINT FOR CIVIL RIGHTS VIOLATION AND INJUNCTIVE AND DECLARATORY RELIEF: <br><br> 1.  42 U.S.C. § 1983 [Free Speech] <br> 2.  42 U.S.C. § 1983 [Due Process] <br> 3.  42 U.S.C. § 1985 [Civil Conspiracy] <br> 4.  California Constitution, Art. 1, §2 <br> 5.  California Constitution, Art. 1, §7 <br><br> DEMAND FOR JURY TRIAL |

PLAINTIFFS African Firefighters in Benevolent Association ("AFIBA") and

JABARI JUMAANE ("JUMAANE") (collectively referred to as "PLAINTIFFS")

alleges as follows:

36159957v3

COMPLAINT

## THE PARTIES

1. PLAINTIFF JUMAANE is and was, at all times mentioned, herein a resident of the County of Los Angeles in the State of California.

2. PLAINTIFF AFRICAN FIREFIGHTERS IN BENEVOLENT ASSOCIATION ("AFIBA"), is and was at all times mentioned herein, an unincorporated non-profit association organized and existing under the laws of the State of California.

3. DEFENDANT MARQUEECE HARRIS-DAWSON ("COUNCILMAN") is and was at all times mentioned herein, an individual elected by the public to serve on the Los Angeles City Council.

4. DEFENDANT CITY OF LOS ANGELES ("CITY") is and was at all times mentioned herein, a municipal entity organized and existing under the laws of the State of California.

5. Plaintiff is unaware of the true names and capacities of Defendants sued as DOES 1 through 10, inclusive, and therefore sues those Defendants by such fictitious names.  Plaintiff will amend this complaint to allege such true names and capacities as and when they are ascertained.  Upon information and belief, each such fictitiously named Defendant is in some way responsible for the events and happenings referred to herein, or claims some right, title or interest in the subject action and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

6. At all times mentioned herein, Plaintiff is informed and believes and thereon alleges that each and every Defendant, including the fictitiously named Defendants, was the agent, employee, and/or servant of every other defendant, and performed the acts complained of herein in the course and scope of such agency, servitude, and/or employment, and acted with the consent, ratification, permission, knowledge, and/or authorization of each of the remaining defendants.  Plaintiff is informed and believes and thereon alleges that at all times relevant hereto, each of

the Defendants and the fictitiously named Defendants acted in concert and in furtherance of each other's interest.  In fact, there is a unity of interest and ownership between and among all Defendants and that any separateness between them has ceased to exist, such that Defendants, and each of them are the alter ego of each other.  Based on the facts as alleged herein, adherence to the legal fiction of the existence of all Defendants separate and apart from each other would sanction their wrongful conduct and promote injustice.

## **JURISDICTION AND VENUE**

7. The Court has personal jurisdiction over all DEFENDANTS, CITY OF LOS ANGELES, COUNCILMAN MARQUEECE HARRIS-DAWSON and DOES 1-10 because each is a resident of and/or working and/or doing business in the County of Los Angeles in the State of California and because the County of Los Angeles is where Defendants' records relevant to the alleged unlawful practices are maintained and administered.

8. This action arises under the Constitution and the laws of the United States. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§1331 and 1343. Plaintiffs' claims for declaratory relief and injunctive relief are authorized by 28 U.S.C. §§2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.  Plaintiffs' claim for damages is authorized by 42 U.S.C. §1983.  Plaintiffs' request for attorney fees is authorized by 42 U.S.C. §1988.

9. Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

10. Plaintiffs further invoke the supplemental jurisdiction of this Court under 28 U. S. C. §1367(a) to hear and adjudicate state law claims.

11. Plaintiff has satisfied the claims statute by filing a claim with the City of Los Angeles in 2020, which has not been denied as of the filing of this complaint.

## **INTRODUCTION**

12. This case seeks to protect and vindicate fundamental constitutional rights. It is a civil rights action brought under the First, Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S. 1983, and the California Constitution challenging Defendants' restriction on Plaintiffs' right to freedom of speech and right to due process.  Based upon false pretenses, Defendants retaliated against Plaintiffs in an effort to quell their right to freedom of speech through a retaliatory eviction and unjustified revocation of the prior license held by Plaintiffs for over 20 years.  Defendants took these actions to prohibit Plaintiffs from objecting to the Councilman's vision for Destination Crenshaw, based upon the content of Plaintiffs' speech and the viewpoint of Plaintiffs' message that was inconsistent with that vision.

13. Plaintiffs seek damages, attorney's fees, a declaration that Defendants violated their clearly-established constitutional rights as set forth in their Complaint, a declaration that Defendants' restriction on Plaintiffs' free speech violates the US Constitution and 42 U.S. C. §1983  as set forth in this Complaint; a preliminary injunction and permanent injunction enjoining the enforcement of Defendants' speech restriction as set forth in this Complaint; and damages for the past loss of Plaintiffs' constitutional rights.  Plaintiffs also seek an award of reasonable costs of litigation, including attorney's fees and expenses, pursuant to U.S.C. § 1988 and other applicable laws.

14. Over the past 3 years Plaintiffs have been substantially harmed by the conduct of Los Angeles City Councilman Marqueece Harris-Dawson ("Councilman").  For the past two (2) years, the Councilman has engaged in abusive, inappropriate, and vindictive conduct directed at Plaintiffs, and the CITY has not only condoned his actions; it has been complicit in them.  The actions are fueled by a personal animus toward Jabari Jumaane, the President of AFIBA.  The

- 4 -

disdain the Councilman has towards Jabari Jumaane has caused him to become outrageous and irrational.  Councilman Harris-Dawson has made emotional decisions that have stripped the Crenshaw community of a vital, historical, and much needed, heavily utilized community center by revoking AFIBA's license to operate out of Firehouse 54 located at 5730-5732 Crenshaw Blvd.  The City and Councilman caused the illegal eviction of AFIBA, which began with revoking the License held by AFIBA.  This action adversely affected a segment of the Hyde Park community which relies on the programming and support they receive from the AFIBA Center under the direction of Jabari Jumaane.

15. The Councilman vindictively had the doors to the AFIBA Center locked and chained, thereby depriving the ENTIRE Crenshaw/Hyde Park community of this iconic Center, which is a bedrock of the African American Community.

16. Councilman Harris-Dawson has embarked on a deliberate and contrived smear campaign against Jabari Jumaane and the AFIBA Center to intentionally defame, discredit, and bring calculable harm to their names and reputations.

17. The Councilman has personally utilized a combination of intentional misrepresentations, falsehoods and disseminating misinformation about Jabari Jumaane and the AFIBA Center to accomplish his goal of removing Jabari Jumaane from the building that is the home of the AFIBA Center.

18. On or about September 12, 2019, Los Angeles Wave Newspaper contributing writer Najee Ali wrote a column that appeared in Los Angeles Wave Newspaper ("The Wave").  (A true and correct copy of the Wave Article is attached hereto as **Exhibit A.**)  In the article, Mr. Ali recounts an interview with the Councilman wherein he reports that "[the  Councilman] told the truth of what exactly was going on…."  Clearly, Mr. Ali did not engage in any fact checking nor did he bother to pursue "two sides to [this] story" as he stated he was "taught to do" or he would have discovered that the Councilman's "truth" was objectively at

odds with reality.  The Councilman's interview is riddled with deceit, slanted disclosures, and outright misrepresentations as follows:

(a) The Councilman stated that he "has worked tirelessly with representative of the [AFIBA] to extend an agreement with the City Los Angeles to use a City-owned building on Crenshaw Blvd."

This statement is false.  Councilman has not worked with representatives of AFIBA to extend the Agreement.  As of the date of the column, there had been only ONE meeting with the President of AFIBA.  As of this date, all requests for a meeting from AFIBA with the Councilman were ignored or re-directed.  As previously stated, prior to the Notice of Revocation, neither AFIBA or Jumaane  ever received any written notice regarding complaints from citizens or lack of compliance with the License from the CITY or the Councilman.  The Revocation Notice indicated that AFIBA should contact the CITY to re-negotiate the License, but when Jumaane made the contact as directed in the Notice he was informed by the CITY representative that re-negotiation of the License would not occur.  Clearly, Najee Ali did not follow up with the Councilman and request any proof of him "working tirelessly…to extend an agreement." He will not be able to provide any proof because it is completely not true.

(b) "Unfortunately, after a year of repeated requests, face-to-face meetings and written communication, AFIBA representatives remain unwilling to meet the most basic requirements of using a public facility."

This is a false statement by the Councilman.  There were no repeated requests to Jumaane or AFIBA from the Councilman, there were no written requests to AFIBA or Jumaane from the CITY or the Councilman; and there were no face-to-face meetings: only one face-to-face meeting with Jumaane to REQUEST that the Councilman meet with him to resolve the differences between them regarding Destination Crenshaw.

(c) "First and foremost, the building must be available to the residents of our community. That includes neighborhood councils, community organizations and the City of Los Angeles (the owner) itself."

AFIBA Center has been available for any neighborhood council, community organization or the City of Los Angeles upon request.  Neither

- 6 -

COMPLAINT

AFIBA nor Jumaane have ever received a complaint from the CITY or any organization that access was denied or unavailable.

"Secondly, the building must be opened and well maintained.  Since the Agreement does not require payment by AFIBA, the expectation outlined in the agreement is that AFIBA would maintain the property, provide stated programing and services, and carry the necessary insurance coverage to provide for injury and/or mishaps. Notwithstanding these failures."

The building is well maintained as evidenced by the inspectors from the CITY. The only evidence the CITY put forth is a single photo of a wall in need of repair, when in actuality the walls were in the process of being sanded and repaired when the City took the photograph. This evidence was presented in deceit of the true facts.  AFIBA provided all the stated programs and more than what was stated with the exception of the Harambee Farmer's Market, which ceased to operate over 10 years prior. Lastly, prior to the false accusation through today while locked out, AFIBA has consistently maintained insurance coverage.

(d) "I have tried to negotiate a new agreement that would allow AFIBA to continue to use the space. The requests for negotiation have been met with silence by AFIBA."

This statement is completely false and bears no truth in reality.

(e) "This week, the City department that manages public assets was refused entry onto the property. That is completely unacceptable and inevitably triggered eviction proceedings."

There was no request to enter the property and there was no refusal.  The Notice of Revocation was served on August 9, 2019 over one month prior to the fabrication of an alleged refusal to allow entry. The Councilman was not truthful about the events as they transpired.

19. At a City Council meeting held on September 18, 2019, Councilman Harris-Dawson made his personal vendetta against Jabari Jumaane unequivocally clear.  In an attempt to assuage the crowd about the potential loss of the AFIBA

36159957v3

Center, the Councilman intentionally misrepresented that the City's license was not with AFIBA, but with Jabari Jumaane, himself.  When Jabari Jumaane sought clarification about that representation, the Councilman clarified that he meant that his intention was that although the AFIBA Center would stay, Jabari Jumaane would have to be eliminated.

20.  The Councilman was determined to abuse his governmental power to pursue his personal retribution to silence Jabari Jumaane and attempt to use the City's resources to excise Jabari Jumaane from his role as Director of the AFIBA Center.  Councilman Harris-Dawson clearly had no concern that his actions would hurt the very community he swore to serve in his capacity as Councilman for the 8th District, in the City of Los Angeles.  Apparently, the Councilman believes he has the authority to control who will preside as the main authority of AFIBA and who will operate the AFIBA Center.  As far as the Councilman is concerned the AFIBA Center is simply collateral damage to his ultimate goal to rid the community of Jabari Jumaane, by any means necessary.  Otherwise, the Councilman is completely unconcerned about the AFIBA Center, and all the services it provides to the 8th District, and the African Americans who reside therein.

## SUMMARY OF FACTS GOVERNING THIS MATTER

21. AFIBA is a non-profit unincorporated association.  The acronym stands for African Firefighters in Benevolent Association.  It was organized in February 1992.  The stated purpose of the organization was to develop policies, programs and forums that have always at the center of their focus not only the advancement of African American firefighters on their respective fire departments but a special concentration on the economic and social challenges that plague the African American community in general.

- 8 -

22. Over the ensuing years, AFIBA's mission expanded from solely concerning itself with firefighters to the African American community as a whole. In furtherance of its purpose, AFIBA obtained a license from the City to occupy Fire Station 54, located at 5730-5732 Crenshaw Boulevard, Los Angeles, California. The license was to use Fire Station 54 for the benefit of the local community in the Crenshaw neighborhood.

23. On April 13, 2001, the City and AFIBA entered into the License Agreement. AFIBA agreed to provide the following services: (a) holistic health care seminars; (b) CPR training for community residents; (c) community conflict resolution services; (d) programs promoting African American social and cultural awareness; (e) a farmer's market for the Harambee Farmer's Market. The License agreement gave AFIBA the right to use Fire Station 54. It was revocable at the City's discretion by way of a 30-day notice. The License provided for immediate revocation by the City in the event that AFIBA failed or refused to keep or perform any of the provisions or conditions of this License. (A true and correct copy of the License is attached hereto as **Exhibit B**.)

24. AFIBA and Jumaane moved in to occupy Fire Station 54 and renamed it the AFIBA Center. From 2001 to 2021, the AFIBA Center has fulfilled all of its responsibilities under the License Agreement that were within its power to provide. The only service that was not provided since approximately 2011 was the farmer's market for the Harambee Farmer's Market, which was unable to continue due to economic challenges suffered by the participants and a competing Farmer's Market that refused to adhere to the guidelines set up by the market managers to ensure the market participants enjoyed an equal opportunity to sell their produce.

25. Neither AFIBA nor Jumaane received a complaint from the City that the services that the AFIBA Center was providing were out of compliance with the terms and conditions of the License. The AFIBA Center was flourishing. In fact,

36159957v3

since the inception of the original license agreement the AFIBA Center had expanded its programming to include eight additional categories of programs for the benefit of L.A. residents citywide.  (These included Cultural dance, Disaster preparation, education in diverse spirituality classes, economic workshops, relationship workshops with the Association of Black Psychologists, Cinema training for youth and adults, Cinema Screenings/ discussion series, Summer Acting Camp for Youth and the Summer Playwriters workshop for youth.)   The community was being served with the multiplicity of services and events put on at the AFIBA Center.

26. In 2008, the construction of the 8.5-mile Crenshaw/LAX light rail line was announced by Metro.  The plan deeply polarized communities along Crenshaw Boulevard. This and the encroaching gentrification of areas like Leimert Park led to the formation of "Destination Crenshaw," a planned 1.3-mile cultural district spanning Crenshaw Boulevard from 48 to 60th streets.

27. "Destination Crenshaw" ("the Project") came about as a result of conversations related to the building of the Crenshaw/LAX Metro line and the controversy in the community that remains to this day about the portion between Hyde Park and Leimert Park…" as the Councilman was quoted.  Destination Crenshaw was targeted to be completed in Spring of 2020.

28. The Project was presented as being designed as a catalyst for economic development. According to the Councilman, the community will directly benefit from the improvements that are made.

29. The Councilman had a vision for Crenshaw Boulevard that he sought to impose on the inhabitants there without so much as a conversation with community leaders in the various portions of Crenshaw Boulevard and the surrounding areas that would be impacted by the Project. What was to become unequivocally clear is that the Councilman was intolerant of any potential obstructions or dissent from

36159957v3

executing his vision of Destination Crenshaw and was intent on using his political might to eliminate the resounding opposing voices to his plan.

30. The Destination Crenshaw project's impact to the AFIBA Center as proposed was severe.  The Councilman proposed a 12-foot tower to be placed in the middle of the parking lot of the AFIBA Center, thereby eliminating 13-15 parking spaces of a 23-space parking lot for the visitors of the AFIBA Center.  The Councilman's plan was to occupy the remaining area of the parking lot with what he referred to as a "pocket park."  He further planned to remove the block walls and wrought-iron fences around the parking lot, which posed a security and hygienic problem to the operations of the AFIBA Center insofar as keeping the AFIBA Center free from homeless encampments setting up.  The AFIBA Center was already removing feces, trash, and urine daily from vagrants deposing such around the building.  Because the Councilman never took the time or opportunity to discuss the impact the Project would have on the AFIBA Center, he was impervious to the change in the daily regimen of the AFIBA Center or its daily visitors' access, enjoyment, and safety.

31. In essence, the Councilman proceeded to impose his vision of Crenshaw without ever so much as speaking to the members of the community, leaders of various community organizations, or inhabitants of Crenshaw Boulevard to gain an understanding on how his vision may not be embraced, appreciated, or warranted. He failed to seek input from organizations who existed on Crenshaw Boulevard. The AFIBA Center was a place where many of these complaints were discussed.

32. The adverse impact to the AFIBA Center was never assessed or discussed.

33. In 2018, President Jabari Jumaane began to publicly raise three core issues regarding the impact of The Project on the present residents of Crenshaw Boulevard and surrounding areas, i.e., Hyde Park: 1) Define the economic benefit

36159957v3

to the Crenshaw community; 2) Inclusion of the Hyde Park stakeholders in the decision-making process of Destination Crenshaw and 3) Discussion the adverse impact on the AFIBA Center on Destination Crenshaw, i.e., the elimination of parking spaces for visitors and safety issues created by removal of the walls and fences around AFIBA. ("The Core Issues")

34. Jumaane raised these concerns along with other concerned community advocates.  He repeatedly requested a meeting with the Councilman.  Between Feb. 10, 2018 and May 2019 Jumaane would attempt on at least four different occasions to get on the Councilman's calendar through the channel the Councilman directed him and all efforts were avoided and misdirected.

35. Jumaane was speaking out against the vision of the Councilman, as it seemed he was determined to ignore and intentionally overlook the concerns of the inhabitants of Crenshaw Boulevard if those concerns were seen as an impediment to completing his Project.

36. Throughout 2018 and most of 2019, Jumaane continued to publicly criticize the Councilman; continued to publicly questions the efficacy of Destination Crenshaw and raise red flags regarding the Councilman's lack of inclusion of the Crenshaw/Hyde Park community in the decision-making process with regard to the implementation and impact of Destination Crenshaw.  The AFIBA Center loyalists were becoming increasingly anxious and concerned about the potential adverse impact.

37. AFIBA members joined with other community groups and individuals in town hall and other meetings questioning the underlying intentions and consequences of the Councilman's vision for the Destination Crenshaw project.

38.  As their angst increased, Jumaane's demands to be included and criticism of the Councilman's imperviousness to their needs increased. His public outcries to gain an audience with the Councilman were resounding.

36159957v3

39. After being served with the Notice to Vacate in 2019 through the present, AFIBA joined with stakeholders in the community in distributing flyers calling for member of the community to "join in our efforts to fight back against those who seek to displace, marginalize and price-out lifelong residents of this community." At a groundbreaking for Destination Crenshaw on February 29, 2020, Jumaane also joined with area stakeholders in supporting a recall effort of Councilman Harris-Dawson for his neglect of the substantive community needs and programs.

40. AFIBA held the license without incident for over 20 years.

41. On March 2, 2019, Jumaane and AFIBA generated a banner that read "Councilman Marqueece Harris Dawson Please don't ignore our concerns!"  This banner was placed across the entrance of the parking lot to the AFIBA Center for the entire Crenshaw Community inhabitants and public transportation drivers and passengers to observe. That same day AFIBA hosted the rally for community survival at the AFIBA Center with a cross-section of community stakeholders as speakers to address their collective concerns with Destination Crenshaw, gentrification and the lack of community support by elected officials.

42. In or about April 2019, Jumaane, a representative from the Hyde Park community, a representative from the Park Mesa Heights community, and other individuals met with the Councilman's advisor to express their concerns with the Destination Crenshaw Project.  This advisor appeared very irritated at the expression of these concerns.  On information and belief, after the Councilman was advised of the heightened opposition, he then contacted the City of Los Angeles Real Estate Services to start researching if there were any grounds to evict the AFIBA Center on his belief that the AFIBA Center and Jumaane posed a threat to the Councilman's vision of the Destination Crenshaw Project.

43. On August 9, 2019, the Councilman via the City in retaliation for Jumaane's speaking out negatively against the Councilman's vision issued a Notice

36159957v3

of Revocation of AFIBA's license to occupy Fire Station 54 located at 5730-5732 Crenshaw Boulevard. (A true and correct copy of the Notice of Revocation is attached hereto as **Exhibit C**.)

44. On August 17, 2019, AFIBA Center sponsored the first annual black consciousness caravan.

45. Jumaane espoused that the Councilman's obsession with bringing Destination Crenshaw to fruition without first developing programs to firmly root residents and stakeholders into residential and commercial properties of the 8th district would essentially expedite the gentrification in this district instead of promote economic development for the advancement of the African American community that inhabits the Crenshaw Blvd./Hyde Park area. accused the Councilman of promoting gentrification and colonizing developers as opposed to promoting economic development for the advancement of the African American community that inhabits Crenshaw boulevard.

46. Angered by Jumaane's public speaking out against his vision to revitalize Crenshaw Boulevard, the Councilman generated a plan to silence and eliminate Jumaane's public speaking out and neutralize his message.  The Councilman would accomplish this by abusing his governmental power and revoking the license to the AFIBA Center thereby removing AFIBA and Jumaane and punishing him for exercising his right to free speech that was not in favor of the Councilman's vision for Crenshaw Boulevard.

47. After hanging the banner, holding the rally, and sponsoring the first annual black consciousness caravan, the AFIBA Center was served with a Notice to Vacate Premises, which Plaintiffs are informed and believe was  at the direction of the Councilman.

48. AFIBA had never received any complaints about its services or the operations of the AFIBA before the Revocation Notice was served on the AFIBA

Center.

49. In the body of the Revocation Notice, the City stated "If you are interested in negotiating a new license agreement for the Premises please contact Senior Real Estate Officer Paul Burke of the City's General services Division by telephone xxx or by email:xxx"

50. Jumaane immediately contacted Paul Burke in compliance with the offer of the Notice of Revocation to express his interest in "negotiating a new license agreement for the Premises…"  He was informed that the option was not available to him or the AFIBA Center.

51. AFIBA and Jumaane sounded the alarm and immediately warned the public of the City and the Councilman's action.  A call to action was made to stop the Councilman from abusing his power.  Jumaane repeatedly attempted to meet with the Councilman, and all requests were ignored and denied.  After a year of failed attempts to schedule a meeting with the Councilman utilizing the modes of communication he instructed, it became clear that the Councilman had no intention of meeting with Jumaane and was deliberately avoiding meeting with the members of the AFIBA Center.

52. Although the City had the authority under the License to revoke without cause, the City moved under the provision indicating Immediate Revocation for cause section 8 stating that "the Licensee may be immediately revoked by CITY in the event of any failure or refusal on the part of the LICENSEE to keep or perform any of the provisions or conditions of this License.  Notice of revocation may be given by CITY in the manner provided in Section 7 above."

53. In the eviction proceedings, the CITY represented the following basis for the Notice of Revocation.

(a) According to the City, it claims that "[i]n the summer of 2019, the CITY learned of concerns about the existing service levels of [AFIBA]."

(b) Allegedly the Councilman received some complaints from local residents about restrictions on the use of the [AFIBA Center]."

(c) The CITY further claimed that AFIBA's FACEBOOK page was significantly out of date in terms of advertising about upcoming events. "

(d) "In addition, one of the community services to be provided by AFIBA under the terms of the Agreement, a Farmer's Market, had also ceased operating at the [AFIBA Center] had also ceased operating…"

(e) General Services Department reported some property management issues:

(1) In the early summer of 2019, allegedly several staff members requested a copy of the key to the main gate of AFIBA but was denied a copy of the key by Jumaane but allowed inside the premises.

(2) Staff members "… noted that that one of the bathrooms inside the AFIBA Center had paint damage that had not been addressed although repairs and maintenance had been AFIBA's responsibility under the license agreement;"

(3) There were community complaints that the AFIBA Center "was not being utilized as well as it could for the benefit of the community."

(4) "AFIBA was invited to negotiations over a new license agreement…"

(5) The City was concerned that AFIBA was not maintaining insurance coverage.

(6) AFIBA was an unincorporated association, but the City requires prospective licensee to be incorporated as a non-profit corporation.

54.    The City generated this laundry list of pretexts for pursuing the eviction of the AFIBA Center and were instructed by the Councilman to use the list to evict AFIBA.

36159957v3

55. What is noteworthy is that NOT ONE of the issues raised in paragraph 53 were ever raised to AFIBA PRIOR to the City and the Councilman issuing the Notice of Revocation.

56. More importantly, Not ONE of the issues is a basis for revocation for cause as none of them are accurate or reflect the entire circumstance.  For instance, the Farmer's Market had ceased to operate 10 years before as a result of the previous Councilmembers actions which made it impossible for vendors to prosper at the Harambee Farmer's Market.

57. There were no concerns raised to AFIBA from the City or from the community regarding existing service levels.  The service levels were excellent, which the Councilman would have known had he bothered to make a proper inquiry or meet with Jumaane.

58. AFIBA was invited to negotiate.  While that statement existed in the Notice of Revocation, when Jumaane ceased the opportunity he was flatly denied by City officials.

59. The allegation that the City was concerned about AFIBA maintaining insurance coverage was simply a false premise.  When asked by the City to produce proof of insurance, AFIBA promptly provided the City with a valid certificate of insurance proving the City's accusation to be false.

60. The allegation regarding repairs is similarly misleading.  AFIBA has always maintained the building properly.  The City sent its inspectors, who returned

a finding that the building was being maintained.

61. The alleged community complaints were NEVER brought to the attention of AFIBA nor were the purported complainants ever identified.

62. The Facebook page was not a mainstay of AFIBA.  It was not required by the license or the City to establish or maintain.  AFIBA determined that other means were more effective to communicate with its members.  Community groups, organizations, and individuals who showcase their programs at the AFIBA Center are responsible for promoting their activities through their own websites, email lists, and social media outlets.  The City requested proof from AFIBA of its activities for the last 3 years in the form of hardcopy calendars, including a breakdown of how many activities AFIBA hosted per month on average for the past 3 years. AFIBA immediately produced the last 3 years of calendars requested by the City and demonstrated that on average we hosted 22 events per month. This refuted the inference by the City that the building was underutilized and not serving the community.  This completely contradicted the weight and veracity that was given to the Facebook page.  The use of this evidence was clearly a superficial, pretextual rationale to accomplish the goals of the Councilman to shut down AFIBA and Jumaane for speaking out against him.

63. AFIBA, Jumaane and community organizations continued to seek an audience with the Councilman.

64. On September 25, 2019 the Councilman appeared as a guest of the

- 18 -

Front Page radio show hosted by Dominique DiPrima to discuss the homelessness

challenge in the 8th district and the future of the AFIBA Center.  During the show,

the Councilman made the following false allegations:

65.  During the show the Councilman INTENTIONALLY

MISREPRESENTED to the public that:

> "…Mr. Jumaane: it's unfortunate. You know, he – he's been in City Hall; he's been in several papers; he's been in the press saying, "Oh, I've got an – I've got an eviction notice". He's never produced an eviction notice because no eviction notice has ever been sent to him."

This statement is completely false.  AFIBA Center and Jumaane were served

with an eviction notice on August 9, 2019, an entire month and a half prior to the

date of his appearance on the Front-Page radio show.

66. The Councilman continued with his MISREPRESENTATIONS.  He

stated "…What's been sent to him has been a letter from the City, …. to say - [long

pause - music in background]- If you're going to continue this agreement, the - the

requirements have to be transparent and there has to be a reporting process."

67. This statement is completely false.  No letter was ever sent to AFIBA or

Jumaane that states "If you're going to continue this agreement, the - the

requirements have to be transparent and there has to be a reporting process."

68. The Councilman continued with the DECEIT by stating that AFIBA and

Jumaane refused to participate in any negotiations regarding the License:

> "… But if you won't come to the table, to... have that negotiation, you leave the city with almost no choice. If they say we want to renegotiate a – uh – agreement with you that, by the way, his existing agreement is a month to month agreement that could be terminated with two weeks' notice. We're now a year and some change into the time that we've approached him, that the City's approached him about – about redoing that agreement."

36159957v3

This statement is completely and totally untrue.  AFIBA and Jumaane beseeched the Councilman to meet with Jumaane, but he refused the request outright or ignored the request.   AFIBA and Jumaane went to great lengths to request a meeting with the Councilman.  They utilized intermediaries, telephone calls, letters, flyers and finally banners facing Crenshaw Blvd:



69. Another MISREPRESENTATION by the Councilman:

> "…what triggered this whole thing was inspectors went to inspect the electrical panel and they went through and do some other inspections of city property and they weren't allowed access into the building, which triggered the City attorney…"

This statement is simply false.  Not only were the inspectors allowed into the building, but they also approved the conditions during the inspection.

70. The Councilman engaged in deceit by not disclosing the full changes proposed for the AFIBA Center.  He stated:

> "The AFIBA Center - the tower was never planned to replace the AFIBA Center. The AFIBA Center was always meant to be a centerpiece of Destination Crenshaw. How are you going to have - … So if you see the actual drawings, … the tower does is it takes up three parking spaces in

36159957v3

the parking lot of the AFIBA Center for which, even before proposing that, we had worked out a deal - which I think we can still do - worked out a deal with US Bank, which you realize is just four five steps away ...- to use - for AFIBA Center to use those parking spaces. So, they get two parking spaces for every one that they lose. So that, that was already in place.

The - the other thing that - the other asked that we had of AFIBA Center is that there actually be a sign that says this is the AFIBA Center, so that visually people knew that this is/was a center for and by African people to forward the cause of African people in this place. **Those were the only two changes**. And in fact, on the sign, we said, "If you don't want the sign, fine, we won't do a sign." That makes sense to me, why you would not want – not want to call attention to the organization and the fact that it's there on Crenshaw Boulevard. We need as many black organizations on Crenshaw Boulevard front-facing as we can get."

The Councilman intentionally failed to disclose that the tower was not the only proposed addition to AFIBA Center building and parking lot.  The proposed changes as presented to Jumaane included utilizing the parking lot for a "pocket park" which would virtually leave little to no parking spaces at the AFIBA Center. The proposed changes also included removing fencing and walls leaving the AFIBA Center vulnerable to homeless intrusions and campsite set ups.

71.   The CITY pursued the eviction to its final conclusion terminating in a summary judgment based upon the same misrepresentation cited herein.

72. In a meeting with community leaders, the Councilman stated that "the AFIBA Center will remain, but the leadership will change" referring to Jabari Jumaane being removed from the organization.  The councilman does not have the authority to remove a member of an organization based upon his role as a Los Angeles City Councilman. Nevertheless, he made his objective clear with this statement and his intention to use the resources of his position and the CITY to silence AFIBA and its leader, Jabari Jumaane.

73. The AFIBA Center is no longer available to the public at the direction and wishes of the Councilman.

74. The AFIBA Center is padlocked by the CITY personnel. Hence, the Councilman's punishment of AFIBA and Jumaane for exercising his right to free speech was complete on February 3, 2021.

75. AFIBA and Jabari Jumaane were given 30 days to remove their belongings from the AFIBA Center or the CITY stated it will dispose of its contents.

## FIRST CLAIM FOR RELIEF
### Violation of First Amendment Right to Free Speech
### 42 U.S.C. §1983 Against All Defendants

76. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs in this Complaint.

77. Defendants deprived, and are continuing to deprive, Plaintiffs of the rights secured by the United States Constitution.

78. At all material times, Jumaane was engaged in constitutionally protected activity, exercising his clearly established First Amendment right to speak out on matter of public concern; specifically, the Destination Crenshaw City Project to revamp the 1.3 mile stretch of Crenshaw Boulevard and its impact on the inhabitants of Crenshaw Blvd and Hyde Park area, which is matter of public concern.[1]

79. Defendants sought to effect unlawful prior restraints on Jumaane's lawful speech through a series of adverse actions, including disparaging Jumaane and AFIBA, revoking AFIBA's license, which AFIBA had enjoyed for a nearly 20-year period of occupation of Fire Station 54 located at 5730-32 Crenshaw Blvd., and ultimately evicted Jumaane and AFIBA and chained the doors to the

---

[1] Matters of public concern are those which can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146.

- 22 -

AFIBA Center--all to rid the community of Jumaane.

80. Jumaane, motivated by his moral and social beliefs, has regularly engaged in pro African American speech aimed at protecting his community and constituents of the AFIBA Center from encroaching gentrification and preserving the present stakeholders in the area.  His speech activities include hand-to-hand leafleting, holding press conferences and rallies, and appearing in the news media, on television, radio shows and other public fora.

81. Defendants acted in concert to retaliate against Jumaane and AFIBA for speaking out in public to expose Councilman's divided loyalty to the members of the community he was sworn to serve.  Jumaane made demands that the Councilman address the three core issues regarding Destination Crenshaw as it related to the Crenshaw Blvd/Hyde Park inhabitants: 1) Define the economic benefit to the Crenshaw community; 2) Inclusion of the Hyde Park stakeholders in the decision-making process of Destination Crenshaw and 3) Discussion the adverse impact on the AFIBA Center on Destination Crenshaw.  Jumaane criticized the Councilman of placing a priority on gentrification rather than focusing on the economic development of the African American constituents of Crenshaw Blvd./Hyde Park.

82. Defendants' actions are, in whole or in part, unlawfully motivated by their disagreement with the Plaintiffs' viewpoint concerning the adverse impact of Destination Crenshaw on the AFIBA Center, Crenshaw Boulevard/ Hyde Park inhabitants; and therefore, their actions also constitute unlawful viewpoint discrimination.

83. Defendants acted in concert to retaliate against Plaintiffs for exercising their right to free speech of matters of public concern.  Defendants' actions were motivated to revoke the license and evict Plaintiffs because of Jumaane speaking out against Defendants and NOT for the pretextual list of false claims of AFIBA

- 23 -

failing to meet its obligations.

84. Defendants retaliated against Jumaane and AFIBA by revoking the near 20-year License granted to AFIBA by the CITY.  The reasons the CITY provided for revoking the License were all completely or partially false and offered as pretext to hide the true motivating factor for the revocation.  The revoking of AFIBA's license was to neutralize Jumaane and silence his efforts to expose the alleged deficiencies in the Destination Crenshaw Project.

85. Defendants meted out the ultimate punishment to Jumaane and AFIBA as retaliation against them for Jumaane's exercising his right to free speech by evicting both AFIBA and Jumaane and chaining the AFIBA Center, preventing entry from the community.

86. Defendants' adverse actions injured Jumaane and AFIBA by restraining, preventing, and impairing his lawful speech in a way likely to chill a person of ordinary firmness from propounding further lawful speech.[2]  In fact, as result of Defendants' adverse actions, that chill continues to this day.

87. The Councilman's abuse of his governmental powers used to crush and eliminate the AFIBA Center and Jumaane after 20 years of public service for daring to speak out against his actions and speak up for the community has sent a chill through the community and frightened them into speaking up for fear that he will use the City's power to punish them.

88. As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Plaintiffs are liable.

89. Defendant Councilman Marqueece Harris-Dawson's acts were willful, egregious, malicious and worth of substantial sanction to punish and deter

---

[2] See *Reno v. ACLU*, 521 U.S. 844, 872 (1997) ("The severity of …sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas…")

36159957v3

COMPLAINT

Defendants and others from engaging in this type of unlawful conduct.

## SECOND CLAIM FOR RELIEF
### Violation of Fourteenth Amendment Right to Due Process
### 42 U.S.C. §1983 Against All Defendants

90. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs in this Complaint.

91. The Revocation Notice and Defendants' enforcement thereof violate Plaintiffs' due process rights secured by the Fourteenth Amendment to the U.S. Constitution.  Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law."

92. Defendants' enforcement of the License agreement under the circumstances, as described herein, violates due process by eliminating any opportunity for individuals to adjust or correct perceived or actual errors or conduct that falls below the standard.

93. But for Defendants' arbitrary and unpredictable actions, Plaintiffs could have maintained the License without fearing they may be forced out for exercising their right to free speech.

94. Forcing Plaintiffs out of the AFIBA Center and depriving them of their ability to serve the community due to Defendants retaliating against them for exercising free speech is unconstitutionally arbitrary and does not serve any legitimate state interest.

95. Defendants' Revocation of the License expressly deprived Plaintiffs of their rights and liberties in lawful association by revoking the License on false pretenses.  Defendants did not afford Plaintiffs with a constitutionally adequate hearing to present their case that the License should not have been revoked, which in essence resulted in the AFIBA Center's complete shutdown. At a minimum,

- 25 -

Plaintiffs should have been able to have an opportunity to address, correct, or resolve any deficiencies in performance under the License perceived by the CITY before the revocation of the License.

96. Defendants failed to comply with the procedural requirements of the U.S. Constitution in connection with Plaintiffs' rights and liberties as they relate to their respective properties / associations. Had Defendants done so, this would have given Plaintiffs a meaningful opportunity to respond to the purported deficiencies and explain how and why their claims of underutilization, disrepair, restricted access and absence of the Farmer's Market were inaccurate and that revocation was not warranted and unconstitutional as applied to Plaintiffs.

97. Because Defendants' decisions in issuing their revocation were made in reliance on procedurally deficient and substantively unlawful processes, Plaintiffs were directly and proximately deprived of their property, and consequently, their ability to lawfully continue in the occupation of Fire Station 54 and operate their businesses without unconstitutional government overreach and abuse of power.

98. Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF
### Conspiracy to Violate Civil Rights,
### 42 USC §1985(3) against all Defendants

99. Plaintiffs re-allege and incorporates by reference all of the preceding paragraphs in this Complaint.

100. Defendants and John Doe came to mutual agreement and understanding to silence Jumaane and AFIBA and punish them for engaging in free speech that was negative to the Councilman and served as an opposition to his vision for

Destination Crenshaw.

101. In furtherance of the conspiracy John Doe and Defendants undertook acts that would not have been undertaken without the agreement.  Those included making false allegations against Jumaane and the AFIBA Center, making false claims of Jumaane's failure to meet the obligations of the License, revoking the License as a means to restrict Jumaane's free speech.

102. Jumaane and AFIBA's rights were violated as a result of the conspiracy, causing irreparable harm.

103. As a direct and proximate cause of Defendants' unlawful activity, Plaintiffs have suffered and continue to suffer economic and non-economic damages for which Defendants are liable in an amount to be proven at trial, including attorney fees and costs under 42 U.S. C. §1988.


**FOURTH CLAIM FOR RELIEF**
**Violation of California Constitution, Art. 1, §2**
**Against All Defendants**

104. Plaintiffs re-allege and incorporates by reference all of the preceding paragraphs in this Complaint.

105. Defendants' License as applied violates Article 1, Section 2 of the California Constitution.


**FIFTH CLAIM FOR RELIEF**
**Violation of California Constitution, Art. 1, §7**
**Against All Defendants**

106. Plaintiffs re-allege and incorporates by reference all of the preceding paragraphs in this Complaint.

107. Defendants' License on its face and as applied violates Article 1, Section 7 of the California Constitution.

36159957v3

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests the following relief:

(a)     Judgment against Defendants.

(b)     An order declaring that the Defendants violated the Plaintiffs' rights protected under the First and Fourteenth Amendments to the United States Constitution and Article 1 sections 2 and 7 of the State of California Constitution.

(c)     An order that Defendants engaged in an unlawful viewpoint discrimination in violation of the First Amendment and Fourteenth Amendments of the United States Constitution and the State of California Constitution.

(d)     An entry of judgment for Plaintiffs of no less than $1 against Defendants in their individual capacities.

(e)     An award to Plaintiff of reasonable attorneys' fees and costs incurred in connection with this action from Defendants.

(f)     To retain jurisdiction of this matter to enforce the terms of the Court's orders; and

(g)     An order granting such further and different relief as this Court may deed just and proper of that is necessary to make the Plaintiffs whole.


Dated:  April ___, 2021

                              MOBLEY LAW OFFICE, PC


                              By: _____
                                   Felicia A. Mobley
                                   Attorneys for Plaintiffs

36159957v3

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

36159957v3

COMPLAINT